1

2

3

4               UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7    LINDA WOO,                              Case No.  13-cv-4195 JSW

8                    Petitioner,

9         v.                                 **ORDER DENYING PETITION FOR**
                                             **WRIT OF HABEAS CORPUS**
10   DEBORAH K. JOHNSON, Warden of the
     Central California Women's Facility,
11
                    Respondent.
12

13

14                          **INTRODUCTION**

15        Petitioner Linda Woo, a state prisoner, has filed a habeas corpus petition pursuant to 28

16   U.S.C. section 2254 challenging the constitutional validity of her state conviction due to the jury

17   instructions given at the sanity phase of her trial.  On October 25, 2013, the Court ordered

18   Respondent to show cause as to why the petition should not be granted.  On March 18, 2014,

19   Respondent filed an answer requesting that the Court deny the petition for writ of habeas corpus

20   on the merits.  On June 19, 2014, Woo filed a traverse in opposition to Respondent's answer.  For

21   the reasons set out below, the petition is DENIED.

22                          **BACKGROUND**

23        At the beginning of the sanity phase trial, the trial court preinstructed the jury with

24   CALCRIM No. 3450, which permits a finding of insanity where the defendant is unable to "know

25   or understand" the difference between moral right and wrong.  At the close of evidence, the trial

26   court instead instructed the jury with CALJIC No. 4.00, which is the earlier version of the standard

27   instructions that establish a finding of insanity where the defendant is unable to "distinguish"

28   moral right from wrong.  Woo argues that these two standards are substantively different because

United States District Court
Northern District of California

the "distinguish" language of CALJIC No. 4.00 equates to the "knowing" element but lacks the deeper appreciation that the term "understand" of CALCRIM 3450 requires. However, the California Supreme Court has found that CALJIC No. 4.00 "correctly and adequately explains the applicable law." *See People v. Jablonski*, 37 Cal. 4th 774, 831 (2006); *People v. Kelly*, 1 Cal. 4th 495, 535 (1992); *People v. Coddington*, 23 Cal. 4th 529, 608 (1990). Woo seeks to distinguish these cases by establishing that none of the holdings address the specific issue raised regarding the semantic differences between CALJIC No. 4.00 and CALCRIM 3450.

The California Court of Appeal rejected Woo's premise that California's insanity law requires this deeper level of appreciation and furthermore found no significant difference between an inability to "distinguish" right from wrong and an inability to "know and understand" right from wrong. A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). To the extent Woo challenges the propriety of CALJIC No. 4.00 under state law, Woo's claim does not warrant habeas relief because this Court is bound by state's interpretation of its own law. *Id.* Because the state court is the final arbiter of what is required under California law and has concluded here that the jury instructions given correctly conveyed the requirements of the insanity defense, this Court is bound by the state court's interpretation of the adequacy of state law.

A.    **Procedural Background.**

Woo was charged with the following: murder of her three-year-old daughter; attempted murder of her four-and-a-half year old son; a special allegation that she committed the offense willfully, deliberately, and with premeditation; and assault on a child less than eight years of age by means of force likely to cause great bodily injury. Following a jury trial, Woo was convicted of murder and attempted murder with the special allegation found to be true. Jurors could not agree on the verdict for the third count and, as a result, the trial court declared a mistrial.

After the sanity phase and following deliberations, the jury returned a verdict finding Woo sane as to both counts of conviction and the related special allegation. On November 24, 2009, the trial court sentenced Woo to state prison to serve concurrent sentences of twenty-five years to

1  life and life in prison, both with the possibility of parole.

2        On March 23, 2012, the California Court of Appeal affirmed the judgment of conviction.

3  (Pet. Ex. A.)  On June 13, 2012, the California Supreme Court denied the petition for review.

4  (Pet. Ex. B.)  This federal petition was filed on September 10, 2013.

5  **B.      Factual Background.**

6        Woo was convicted by a jury of murder and attempted murder with a special allegation

7  that she committed the offense willfully, deliberately, and with premeditation, and assault on a

8  child less than eight years of age by means of force likely to cause great bodily injury.  The jury

9  found that Woo was legally sane at the time of commission the crimes.

10       The facts underlying the charged offense as found by the Court of Appeal of the State of

11 California are set forth as follows:

12            Woo married Galvin Murphy in 1993.  They had a son, C., born in
            September 2001, and a daughter, Olive Murphy, born on January 8,
13          2003.  They owned a house in San Francisco and a vacation home in
            Miwok.  Gavin worked as an engineer and Woo worked as a rate
14          analyst for PG&E.  Woo began working for PG&E in 1995,
            continued working there part-time after C. was born, and
15          volunteered at the nursery school the children attended.  In early
            2005, Woo told Galvin that she wanted a divorce.  At the time she
16          was involved in a love affair with Eric Embry.

17            Embry was a photographer who met Woo in November 2000, when
            he traveled to San Francisco from his home in Tennessee to
18          participate in a photo shoot at PG&E.  One night during the week-
            long photo shoot they had sex in a motel.  Embry gave Woo a
19          mailing address in Tennessee, and she tracked down his phone
            number and email address.  She telephoned him, and sent him letters
20          and emails.  She and Embry had sex again when he returned to San
            Francisco for a visit in July 2002.  In December 2003, Embry moved
21          to San Francisco to be close to his sister and to further his
            photography career.  When he told Woo about the move, she said,
22          "Oh, no" "I wish you wouldn't do that," because she felt her
            attraction to him would jeopardize the marriage.
23
              Embry testified that he and Woo carried on their affair throughout
24          2004.  They called and emailed each other every day and got
            together for two or three hours, three to five days a week.  By
25          February 2004 they were "madly in love."  They knew the affair was
            wrong but did not have the will to end it.  In early 2005, Embry felt
26          that the affair had "obviously gone too far" when he learned that
            Woo and Gavin were getting divorced.  He had no intention of
27          marrying Woo, and had made clear to her at the beginning of the
            affair that he did not want to be a parent.  Embry broke off the affair
28          in March 2005.

United States District Court
Northern District of California

3

That month, Woo began therapy with psychologist Daryl Goldman, and continued seeing Goldman until she attempted suicide. Woo told Goldman that Embry was refusing to see her and that she was contemplating suicide. She felt closer to Embry than she had to any other person in her life. She could not stop driving by his home after the break up. She guessed the code for his voice mail, and was ashamed because she could not stop listening to his messages. Woo reported loss of weight, insomnia, fatigue, and difficulty concentrating. Goldman diagnosed her with Major Depressive Disorder (MDD), single episode, moderate, and referred her to a psychiatrist who prescribed the medication Lexapro, which she stopped taking after five months. By May 3, 2005, Goldman believed that Woo's depression was resolving.

Embry testified that after a chance encounter in early May, he and Woo resumed seeing each other as before. Goldman noted that Woo's mood improved over the summer after she started seeing Embry again. Gavin moved out of Woo's home in June, and started dating Leila Easa in July. Embry testified that Woo's "attitude" during this time "was that her marriage was over and so I could be a legitimate part of her life." But Embry told her that they had no long-term future and he did not want their affair to be publicly revealed. Woo told Goldman that Embry was "very push-pull. That he would resist spending time with her, getting close, and then they would spend incredible time together." Goldman said that Woo's moods and suicidal ideations fluctuated with these cycles. Goldman likened Embry to a slot machine Woo could not walk away from because he sometimes provided the deep emotion that was missing in her marriage.

Goldman testified that, except for a brief period of improvement in January 2006, Woo's depression worsened after September 2005. At Olive's birthday party in January, Gavin told Woo that he suspected she had been having an affair. Goldman said that Woo "had more hope through parts of January once everything was out about [Embry]. But then it was clear by the end of January that it was not making a difference with [him]." Embry called Woo on March 1, 2006, intending to break up with her and never speak to her again. She flooded him with calls for a week, at one point calling his cell phone 40 times in a row, begging him not to abandon her. Embry did not answer the calls.

In Goldman's opinion, Woo was then suffering from MDD. Her depression was so severe that, throughout the month of March, Goldman considered having her involuntarily committed under Welfare and Institutions Code 5150 as a danger to herself. Goldman believed Woo when she said that she would not commit suicide because doing so would hurt C. and Olive, but she was sufficiently concerned about the risk of suicide that she urged Woo to have people around her when she was not with her children. Goldman believed Woo when she said the children "were the purpose in her life," and she would not do anything to harm them. Woo looked and sounded terrible when Goldman last saw her on March 23, but Woo insisted that she was okay when they last spoke on the phone on March 28.

4

Gavin testified that Woo "adored those kids," and that he could not imagine her hurting them. Embry testified under cross-examination that, prior to March 29, 2006, Woo never mentioned to him any plan to harm her children. In fact, he thought she lived for her kids, and even when everything was crumbling around her, her priority was always her kids. Clark testified that no one worried about the children when Woo talked about suicide in March. Woo told Chao, her friend, that the "two things that are stopping me from committing suicide [are] [C.] and Olive."

Woo told Goldman that she was concerned that Gavin's girlfriend, Easa, would take over her role as the children's mother. Velarde thought that Woo "was concerned about [Easa] and Gavin taking over some parenting duties that [Woo] was doing. [Woo] wanted to be the sole, . . . important parent to the children." Velarde thought Easa "was great with the kids," and that "it would be helpful [to have another person to help out with the parenting . . . but [Woo] didn't see it that way." Woo was "concerned about anyone having influence on her children" as a mother. She had always referred to the children as "my kids," not "our kids." She wanted to be in control of the children and worried about losing that control.

Woo stopped by Embry's home on March 18 on the way to the fundraiser where she met Easa. He was angry when he saw her and told her that she could not come in. She apologized for coming over uninvited and left. Woo was "extremely despondent" when Silva saw her the next day. Silva testified that Woo did not "smile[] at all that day. She was having a hard time focusing on the kids. . . Her body was slumped. She was nervous." David Wolber, a computer science professor who examined the hard drive of Woo's computer, testified that by this point Woo was researching how to commit suicide on the internet under topics such as "suicide carbon monoxide" and "[i]ndoor use of charcoal grill."

Gavin and Chao went to Woo's home on March 20 and tried to persuade her to check herself into a hospital. Gavin told her that she could not kill herself because of the pain it would cause their children. In an interview after the attempted suicide, Woo said that she agreed with Gavin when he said that her suicide "would absolutely ruin [the children's] lives," and "then it dawned on me that I could take them with me and that would spare them pain."

Around March 21 or 22, Woo resumed calling Embry, saying that she was not doing well and asking for help. She told him in a March 23 email that he was the only one who could help her, and added: "I realize it is emotional blackmail . . . but it is the plain truth from where I am right now." Embry called her back on March 24 because she started mentioning suicide. He told her that if she was serious, he would call Gavin and her sisters to get her help. She replied, "Don't call them. I'm not. . . . They will take my children away." When she told Embry she was not serious about committing suicide, he got angry and told her not to call him anymore. He thought that Woo's talk of suicide was "the next installment in however it was that she was going to keep me around."

5

Embry spoke to Woo on March 28, and told her he would call her that night.  After leaving work he tried to send her a text message to let her know he could not make the call, but later discovered that the message had not gone through.  Around 10:00 p.m. he retrieved an email from Woo that said: "I know that you are gone because you didn't call tonight and that's okay.  I know that you are leaving and it's okay."  He thought "she ha[d] finally let go."  Woo called Gavin at 12:34 a.m. on March 29, and left a message that said, "Gavin, I'm just up feeling very sentimental or confused.  Goodbye."  He considered the message as a hopeful sign that the anger Woo had been directing toward him was lessening.

The night of March 28, Embry parked his car on the street near his house.  When he got up to go to work the next morning, his car was gone and Woo's car was parked in its place.  Woo had a key to Embry's car and he though she must have taken it.  He called a co-worker for a ride to work and had the driver stop at Woo's home so he could confirm that she had his car.  When they got to her house, Embry opened a mail slot to the garage and saw his car inside.  Given what had transpired with Woo, he feared that the engine would be running, but it was not.

Embry entered the house through a back bedroom door, went to the garage, and found Woo, C., and Olive lying on the lowered back seat of the car.  When he opened the rear driver's side door, Woo and C. stirred, and made noises as if they were starting to wake up.  He did not smell anything unusual in the garage and did not look in the front of the seat.  He did not wake Woo and take his car back because he did not want to fight with Woo in front of C.  He was not worried about Woo committing suicide in the presence of her children, and thought she was pulling a stunt in order to prolong their relationship.  He spent two or three minutes at the house and went to work.

Woo was scheduled to work at the nursery school at 1:00 that afternoon, and the school called Gavin at 1:15 when she and the children did not appear.  After Gavin called Woo's home and got no answer, he called Kauth and asked him to check on the situation.  Kauth and Velarde went to Woo's house and found her and the children in the car in the garage.  A hibachi grill with burned out coals was on the passenger side of the front seat.  Woo and C. were alive, but Olive had died from carbon monoxide poisoning.

Woo left the following note, dated March 23, for Embry on the dashboard of the car: "Thank you for trying to stop me.  The only thing you could have said was that you'd be there for me and love me and help me through every step of the way, but that would have been a lie and you couldn't do it, I know.  But you tried and I think you tried more than anyone else.  Clearly, I am not thinking straight.  Everyone will think I'm a monster.  But understand that I know that losing their mother would be more than two children of their ages could handle and I don't want them to go through that awful pain.  It would ruin their lives forever and I don't know what would become of them.  They would have terrible lives.  It was a choice between their pain and everyone else's pain.  I'm sorry, but I had to choose them.  It may be a really fucked up way of thinking, but that is what

I was thinking.  I know the pain and awfulness this will cause everyone, especially Gavin and my mother.  I am very sorry for that.  I really do feel like I cannot go on with this life.  I said a lot of things to you last night, so I don't need to say them all again.  I do this knowing you love me, so thank you.  These last hours are very scary for me and I feel very alone but I think of you last night holding me and I feel better.  I would like very much if you would sing at my memorial service there might be for me and my kids."

Woo left the following note in her kitchen for Gavin: "I am sorry for your pain and your suffering, and also for my mother's and everyone else's.  In the end, I chose the children over all of you.  I cannot let them go through the pain of losing me and then struggling to live a normal life knowing their mother killed herself and left them.  It's too much for them.  I know I am being selfish.  I don't know how to function anymore.  I love my children more than anything.  And you know I don't believe in God.  I know you and everyone will think I am a monster.  I am robbing them of their lives, yes, but I am also saving them from so much sorrow and grief.  I am so sorry.  Oh, Gavin, I know you will miss them every day for the rest of your life.  I'm not going to ask you to forgive me because I don't deserve it.  I know Leila and your mother will help you get through . . . this.  I am so sorry this is happening."

Velarde called 9-1-1 and Woo was taken to San Francisco General Hospital, where she spent over two months in the jail psychiatric ward.  She was treated during her stay by Dr. Gilbert Villela, who described her as "probably one of the most severely depressed patients I have encountered in my clinical experience."  She was placed on a suicide watch for longer than any other patient Villela could recall.  Woo was described in the hospital's exit report as suffering from MDD (the Axis I, primary diagnosis) and having narcissistic traits (Axis II).

**Expert Opinions.**

Six expert witnesses testified in the case: three retained by the defense - psychiatrists Stephen Hall and Jeffrey Gould, and psychologist Patricia Perez-Arce; two appointed by the court - psychiatrists Roland Levy and David Kessler; and one retained by the prosecution - psychiatrist David Kan.  They all essentially agreed that Woo was suffering from MDD in March 2006.  Kan testified that Woo suffered from "Depressive Disorder, Not Otherwise Specified," and exhibited narcissistic and borderline traits, but conceded that she displayed the symptoms for a "Major Depressive Episode," and that "the definition of [MDD] is having a Major Depressive Episode."

The experts also agreed that Woo understood the nature and quality of her acts and that killing her children was legally wrong.  She understood what she was doing, and left behind a note saying that she wanted the suicide to succeed because she would rather die than go to prison.  The experts had divergent views of whether Woo understood that killing her children was also morally wrong.

Hall testified that Woo's thinking was severely distorted by her MDD. MDD creates "an overriding pessimism" that can produce poor judgment. The distortions in Woo's case included her belief that her children would be better off dead than having to live without her after her suicide, which led Woo to believe that killing the children was "morally right." Her thinking was also distorted insofar as she saw no hope for a meaningful life without Embry, which caused her mood to fluctuate with his availability. Woo told Hall that she would not have gone through with the suicide if Embry had shown up that night. She knew that killing the children would hurt many people, and that killing in general was condemned by society. But knowing that people would condemn her actions did not mean she appreciated that her actions were morally wrong.

Gould offered three perspectives on whether Woo believed what she was doing was morally right. First, Gould considered whether Woo understood "the moral values of society," and knew that others would disapprove of her actions. Gould believed Woo was aware that she was "behaving in ways that were incongruous with our society's . . . moral standard," and "knew that others would disapprove and would be hurt by this . . . ."

Second, Gould explored whether Woo believed that killing her children was necessary to protect them from pain. Gould thought Woo had acted, consistent with "generally accepted standards of moral obligation," to protect her children from suffering. Gould rejected other possible motives for Woo's action, such as preventing Easa from parenting the children or a desire to hurt Embry.

Third, Gould addressed whether Woo believed that another "morally upstanding person," knowing what she knew at the time, would have taken the same actions. His answer was "yes." Gould interviewed Woo over the course of 18 hours in jail, and at one point they had the following exchange: "[Q.] Do you . . . think if someone else was in your exact position there, another person feeling your depression leading up to this and your suicidal feeling and your thoughts about your kids, if someone else was in your situation would they have done the same thing." [A.] Yeah. [Q.] Why? [A.] Because it was just the only option in that place that I was. It was such a dark place. It was just the only thing possible to do. [Q.] Suicide or suicide with the children? . . . [A.] Suicide for me and as a result with the kids, because of my love for them."

The other defense expert, Perez-Arce, administered intelligence and personality tests to Woo. Perez-Arce found that Woo "function[ed] at a very high level cognitively," better than 92 percent of the population. Although Woo's performance was at least average on all tests, the tests showed that she could not function well under emotional stress. Perez-Arce's specialty is child development, and she recounted facets of Woo's childhood that contributed to making her "an active outwardly directed," but inwardly lonely, person. She agreed with Hall that Woo's thinking was distorted by MDD, and testified that Woo was "out of touch with reality" when she decided to kill her children. The MDD and the distorted thinking it produced was "the main factor in [Woo] believing that . . . killing her children along with herself would be an act of protection and love." But

Perez-Arce wrote in her report: "The intensity of this new type of love [for Embry] trumped her self-protective and family protective tendencies."

Court-appointed expert Levy testified that Woo "decided that if she couldn't have [Embry], she was going to kill herself." Woo "didn't really want to die, but if she couldn't have him, then there was nothing left and she had to die." He wrote in his report that "[d]ue to her severe depression, she convinced herself it was actually in the best interest of the children for them to die and not have to face life knowing that their mother was suicidal." In Levy's view, Woo's "problem in relationship to the children . . . was twofold: One she didn't want them to suffer without her. And the other was she didn't want them to go on without her where they might end up in a new family and a new mother." When Levy was asked whether Woo was aware that her actions were morally wrong, he answered that she was "aware of that in terms of society at large, not in terms of her own belief." Woo "convinced herself" that it was in the children's best interest "for them to die and not face life without their mother."

Court-appointed expert Kessler found that MDD distorted Woo's thinking into a belief that killing her children was the right thing to do to save them from the pain. He nevertheless opined that she was capable of distinguishing moral right from wrong at the time of her attempted suicide.

Prosecution expert Kan opined that Woo knew that killing the children was morally wrong, and that she was legally sane when the crimes occurred. Kan believed that Woo's behavior was driven less by her depressive disorder than by her narcissistic traits, such as her belief that she was the only one who could adequately parent her children, and her borderline traits, such as her extreme sensitivity to rejection. Kan pointed to what he called the "highly contingent" nature of the suicide attempt, i.e., that Woo would not have tried to kill the children if Embry "had taken her back or had tried to stop her." In Kan's experience, MDD could not typically be alleviated by renewal of a single relationship.

Kan thought that while Woo personally believed that it was morally correct to kill her children, she understood that the killing would violate "generally accepted standards of moral wrongfulness." Support for this conclusion included her suicide note to Embry, where she wrote: "I know the pain and awfulness this will cause everyone, especially Gavin and my mother. I am very sorry for that. I really do feel like I cannot go on with this life. It is completely selfish, I know."

*People v. Woo*, No. A127153, 2012 WL 1015254, at *1-8 (Cal. Ct. App. Mar. 23, 2012).

**C.     Jury Instructions on the Insanity Defense.**

Woo contends it was error for the trial court to instruct the jury at the sanity phase with CALJIC No. 4.00 instead of CALCRIM No. 3450. The findings of the Court of Appeal are

9

1    summarized below as follows:

2          Prior to trial, both sides proposed jury instructions that included the
3    CALCRIM No. 3450 instruction on the insanity defense, which, at
     the time, stated in relevant part: "The defendant was legally insane
4    if: 1. When she committed the crimes, she had a mental disease or
     defect; and 2. Because of that disease or defect, she did not know or
5    understand the nature and quality of her act or did not know or
     understand that the act was morally or legally wrong."  (CALCRIM
6    No. 3450 (Spring 2008 ed.).)  The court furnished this instruction to
     the jury at the outset of the sanity phase trial.

7          When the insanity defense instructions were initially discussed, the
8    prosecution requested that CALCRIM No. 3450 be supplemented
     with the following special instruction: "'Morally wrong' as used in
9    this instruction means the violation of generally accepted moral
     standards and not those peculiar to the accused."  The prosecution
10   also suggested that the CALJIC 4.00 instruction on the insanity
     defense might be more "accurate/complete" than CALCRIM No.
11   3450.  The defense argued that CALCRIM No. 3450 required no
     elaboration and objected to the prosecution's special instruction.
12   The defense filed proposed special instructions to be furnished if the
     prosecution's special instruction was given.

13         When the courts and the parties subsequently conferred on the
14   instructions, the defense objected to CALJIC No. 4.00, and
     contended that CALCRIM No. 3450 should be given without further
15   special instructions.   The court indicated that it was inclined to
     furnish CALJIC No. 4.00 supplemented with additional language
16   rather than CALCRIM No. 3450.  The court said it was continuing
     to work on the issues and invited the parties to submit further
17   instructions they believed were appropriate.

18         The parties submitted emails to the court setting forth their
     positions.  The prosecution proposed a special instruction stating:
19   "For the purposes of this instruction, morality is not simply the
     individual's belief on what conduct is or is not good.  It requires a
20   sincerely held belief grounded on generally accepted ethical or
     moral principles derived from an external source.  Moral obligation
21   in the context of the insanity defense means generally accepted
     moral standards and not those standards set by the Court."

22         The defense proposed the following special instruction: "The wrong
23   contemplated by the two-party sanity test refers to both the legal
     wrong and the moral wrong.  If the defendant appreciates that her
24   act is criminal and legally wrong but does not think it is morally
     wrong, she may still be criminally insane.  The morality referred to
25   in this instruction requires a sincerely held belief grounded in
     generally accepted ethical or moral principles.  Analysis of whether
26   a defendant knew an act was morally right or wrong or the sanity
     determination focuses on the defendant's beliefs and motivations for
27   committing the act not by [*sic*, presumably, the act] itself.  [¶] The
     acts of murder and attempted murder are recognized as not being
28   generally accepted moral acts, however, it is the beliefs and
     motivations of the defendant as to why she committed the acts that

United States District Court
Northern District of California

10

must accord with generally accepted moral standards and it (*sic*) must be considered as to whether defendant considers her act to be morally wrong. [¶] Moral obligation in the context of insanity defense means generally accepted moral standards and not individual standards set by the defendant.

The trial court decided to instruct the jury pursuant to CALJIC No. 4.00 as follows: "A person is legally insane when by reason of mental disease or defect, she was incapable at the time of the commission of the crime of one of the following: 1. Knowing the nature and quality of her act; or 2. Understanding the nature and quality of her act; or 3. Distinguishing what is legally right from what is legally wrong; or 4. Distinguishing what is morally right from what is morally wrong." The court gave the following additional instruction, which appears in CALJIC No. 4.00 in brackets: "Conduct that is morally wrong is conduct that violates generally accepted standards or moral obligation. Legal wrongfulness and moral wrongfulness are often equivalent but that is not always the case." The court also furnished the following special instruction: "The wrong contemplated by the two-part insanity test refers to both the legal wrong and moral wrong. Moral obligation in the context of the insanity defense means generally accepted moral standards and not those standards peculiar to the defendant. The morality referred to in this instruction requires a sincerely held belief grounded in generally accepted ethical or moral principles derived from an external source."

*Id.* at *8-9.

## JURISDICTION AND VENUE

Woo claims violations of the Constitution of the United States and has exhausted all remedies available to her in state court. Accordingly, this Court has subject matter jurisdiction over her habeas action for relief under 28 U.S.C. section 2254(d), and this Court finds this petition timely. *See* 28 U.S.C. § 2254(d); *Bowen v. Roe*, 188 F.3d 1157, 1158 (9th Cir. 1999). In addition, this action is in the proper venue because the challenged conviction occurred in San Francisco County, which is located within this jurisdictional district. 28 U.S.C. § 2241(d); Habeas L.R. 2254-3(a)(1).

## STANDARD OF REVIEW

The Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that she is in custody in violation of the Constitution of laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"); therefore, the provisions of the Act apply. *See Lindh v. Murphy*,

United States District Court
Northern District of California

11

521 U.S. 320, 327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499-1500 (9th Cir. 1997) (holding "justice and judicial economy are better served by applying the Act to cases filed after the enactment date"). Under AEDPA, a district court may not grant a petition challenging a state conviction or sentence with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision is an "unreasonable application of" Supreme Court authority under the second clause of section 2254(d), if it correctly identifies the governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* The federal court on habeas review may not issue the writ "simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409. The writ may be granted under the "unreasonable application of" clause only when the court's "independent review of the legal question does not merely allow [the court] ultimately to conclude that the petitioner has the better of two reasonable arguments, but rather leaves the [the court] with a 'firm conviction' that one answer, the one rejected by the [state] court, was correct, and the other, the application of the federal law that the court adopted, was erroneous - in other words that clear error occurred." *Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).

When deciding whether the state court's decision was contrary to, or an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state

United States District Court
Northern District of California

1  court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217

2  F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state law, the federal court

3  must determine whether state law, as explained by the state court is "contrary to" clearly

4  established governing federal law. *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001).

5       As to issues of fact, under 28 U.S.C. section 2254(d)(2), a federal habeas court may grant

6  the writ if it concludes that the state court's adjudication of the claim resulted in a decision that

7  "was based on an unreasonable determination of the facts in light of the evidence presented in the

8  State court proceeding." *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). "Factual

9  determinations by state courts are presumed correct absent clear and convincing evidence to the

10  contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). To grant relief, an unreasonable

11  determination of the facts by the state court is found by the federal court if it is left with a "firm

12  conviction" that the determination was wrong and the one petitioner urges was correct. *Torres*,

13  223 F.3d at 1108. Thus, a petitioner must present clear and convincing evidence to overcome the

14  presumption of correctness. 28 U.S.C. § 2254 (e)(1).

15                                **DISCUSSION**

16       All of Woo's arguments relate to her subjective awareness that her acts were morally

17  wrong. Woo argues the jury instructions given at the sanity phase of her trial were inadequate to

18  instruct properly on the insanity defense because CALJIC No. 4.00, as opposed to CALCRIM

19  3450, does not address the "deeper appreciation" element associated with moral wrongfulness.

20  Additionally, Woo argues that the trial court erred by refusing to give the jury her proffered

21  special instructions to supplement CALJIC No. 4.00.

22       At the beginning of the sanity phase of trial, the trial court preinstructed the jury with

23  CALCRIM No. 3450 which stated, in relevant part: "The defendant was legally insane if: 1. When

24  she committed the crimes she had a mental disease or defect; and 2. Because of that disease or

25  defect she did not *know or understand* the nature and quality of her act or did not know or

26  understand that her act was morally or legally wrong." *Woo*, No. A127153, at *8 (emphasis

27  added).

28       At the close of evidence, Respondent requested that CALCRIM No. 3450 be supplemented

United States District Court
Northern District of California

1    with a special instruction. *Id.* Respondent also contended that CALJIC No. 4.00 might be more

2    accurate and complete than CALCRIM 3450. *Id.* Woo argued that CALCRIM No. 3450 was

3    sufficient as is, but if the court were inclined to give the Respondent's special instruction then it

4    should also give five other special instructions. *Id.*

5        The trial court ultimately decided against giving CALCRIM No. 3450 and gave CALJIC

6    No. 4.00 along with an optional instruction that appears in the standard instruction in brackets and

7    special instruction the court had drafted. *Id.* at *9. The jury instructions given omitted the

8    "*knowing and understanding*" language that CALCRIM No. 3450 included.

9        The jury instructions given were as follows:

10           A person is legally insane when by reason of mental disease or
             defect, she was incapable at the time of commission of the crime of
11           one of the following: 1. Knowing the nature and quality of her act;
             or 2. Understanding the nature and quality of her act; or 3.
12           Distinguishing what is legally right from what is legally wrong; or 4.
             Distinguishing what is morally right from what is morally wrong.
13           Conduct that is morally wrong is conduct that violates generally
             accepted standards or moral obligation. Legal wrongfulness and
14           moral wrongfulness are often equivalent but that is not always the
             case. The wrong contemplated by the two-part sanity test refers to
15           both the legal wrong and the moral wrong. Moral obligation in the
             context of the insanity defense means generally accepted moral
16           standards and not those standards peculiar to the defendant. The
             morality referred to in this instruction requires a sincerely held
17           belief grounded in generally accepted ethical or moral principles
             derived from an external source.
18   *Id.*

19

20       Woo's contends that CALJIC No. 4.00 does not require the same level of analysis or

21   appreciation that CALCRIM No. 3450 demands with regard to morality. (Pet. Mem. at 37.)

22   CALCRIM No. 3450 requires that Woo "did not *know or understand* the nature and quality of her

23   act or did not know or understand that her act was morally or legally wrong." *Woo*, No. A127153,

24   at *8 (emphasis added). By comparison, CALJIC No. 4.00 requires that the defendant show an

25   inability to "*distinguish* what is morally right from what is morally wrong." *Id.* at *9 (emphasis

26   added). The basis of the argument is whether "*distinguishing*" moral right from wrong demands

27   the same level of analysis as "*knowing and understanding*" moral wrongfulness.

28       Woo alleges that CALJIC No. 4.00 is also inadequate because it refers to a broad, general

14

incapacity to distinguish between moral right and wrong, rather than a specific incapacity to distinguish between moral right and wrong in relation to the crime.  (Pet. Mem. at 32-33.) CALJIC No. 4.00 requires that the inability to distinguish right from wrong must exist "at the time of commission of the crime."  *Woo*, No. A127153, at *10.  In comparison, CALCRIM No. 3450 provides that the defendant was legally insane if "when she committed the crimes, she had a mental disease or defect . . . ."  *Id.*

Woo further alleges that the trial court's decision to reject her proposed special instructions is erroneous.  (Pet. Mem. at 41.)  Woo proposed, "If the defendant appreciates that her act is criminal and legally wrong, but does not think it is morally wrong, she may still be criminally insane."  (*Id.*)  Woo alleges that the trial court's failure to read her special instruction in conjunction with the error of using CALJIC No. 4.00 instruction compounds to create a substantive error that should be cognizable for this Court to grant the writ for habeas corpus.  (*Id.* at 43.)

**A.      California Court of Appeal Opinion.**

The California Court of Appeal rejected Woo's argument that CALCRIM No. 3450 should have been read instead of CALCRIM No. 4.00 on the basis that CALCRIM No. 3450 requires a deeper level of appreciation of moral wrongfulness.  *Woo*, No. A127153, at *9-10.  Woo contends that the language of CALCRIM No. 3450 requiring "knowing and understanding" establishes a deeper level of appreciation that is necessary in order to assess one's understanding of wrongfulness.  *Id.* at *10.  Woo contends that the language of CALJIC No. 4.00 requiring the defendant to "distinguish" merely requires a capacity to know but lacks the "understanding" component that CALCRIM No. 3450 requires.  *Id.*  Thus, according to Woo, CALJIC No. 4.00 is inadequate.  *Id.*

Woo primarily relies on *People v. Skinner*, in which the California Supreme Court held that the *M'Naghten* test would be read in the disjunctive, so that a defendant could be found legally insane if he satisfied either prong.  39 Cal. 3d 765 (1985).  The *M'Naghten* test sets out that "a person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality

1   [wrongfulness] of his conduct or to confirm his conduct to the requirements of the law." *Id.* at 768

2   (quoting *People v. Drew*, 22 Cal. 3d 333, 345 (1978)).  "The California version of the *M'Naghten*

3   test ha[s] been liberalized by holding that 'knowing' in the sense of being able to verbalize the

4   concepts of right and wrong was insufficient to establish legal sanity." *Woo*, No. A127153, at *10

5   (quoting *Skinner*, 39 Cal. 3d at 779) (emphasis added).

6        The appellate court here established that subsequent cases have upheld the adequacy of the

7   language of CALJIC No. 4.00 to track section 25(b) of the California Penal Code.  *Id.* (quoting

8   *People v. Kelly*, 1 Cal. 4th 494, 535 (1992)).  The appellate court found that "distinguishing" right

9   from wrong and "knowing and understanding" right from wrong are synonymous formulations of

10   the same issue.  *Id.*  The California Supreme Court has held, "[t]he relevant inquiry regarding

11   insanity is whether the defendant was incapable of distinguishing right from wrong, that is, of

12   realizing that his crimes were morally wrong."  *Id.*  Thus, the appellate court held that Woo's

13   argument lacked substance.  *Id.*  The appellate court concluded that CALJIC No. 4.00 was not

14   inadequate and that the trial court did not err in providing this instruction to the jury instead of

15   CALCRIM No. 3450.  *Id.* The appellate court also found no prejudice because there was "no

16   reasonable prospect that Woo could have persuaded the jury with an argument that while she

17   'knew' that killing her children was morally wrong, she did not 'understand' that killing them was

18   morally wrong."  *Id.*

19        The appellate court also rejected Woo's argument that CALJIC No. 4.00 erroneously refers

20   to a general incapacity to distinguish between right and wrong, rather than a specific incapacity to

21   distinguish between right and wrong with respect to the specific crime in question.  *Id.* at *10.

22   The appellate court noted that this argument was rejected by the California Supreme Court in

23   *People v. Jablonski*, 37 Cal. 4th, 774, 831 (2006).  In *Jablonski*, the defendant argued that CALJIC

24   No. 4.00 instruction was flawed because it required a general incapacity to distinguish right from

25   wrong, rather than a specific incapacity to distinguish right from wrong in relation to the crime.

26   *Id.*  The California Supreme Court established that Jablonski's argument was a "strained reading"

27   of CALJIC No. 4.00, and that even if the Court accepted the argument, any ambiguity was made

28   clear by the trial court's supplemental instructions.  *Id.* at 831-32.  In addition to CALJIC No.

4.00, the trial court in *Jablonski* instructed, "You may consider evidence of [defendant's] mental condition before, during, and after the time of the commission of the crime as tending to show the defendant's mental condition *at the time the crime was committed.*"  *Id.* at 831 (emphasis added).  The Court in *Jablonski* did not find that CALJIC No. 4.00 needed supplementation or further special instruction in order to be deemed adequate.  Here, the appellate court noted that CALJIC No. 4.00 already states that the inability to distinguish right from wrong must exist "at the time of the commission of the crime."  *Woo*, No. A127153, at *9-10.  As such, the appellate court found that CALJIC No. 4.00 properly focuses the jury's attention on the defendant's state of mind at the time of the criminal act and that the holding in *Jablonski* does not suggest otherwise.  *Id.*

The appellate court also found no error in failing to give the proposed defense special instruction that stated, "If the defendant appreciates that her act is criminal and legally wrong, but does not think it is morally wrong, she may still be criminally insane."  *Id.* at *11.  The appellate court noted that the purpose of this instruction is that a defendant who understands that his or her conduct is illegal may be found criminal insane depending upon his or her ability to distinguish moral right from wrong.  *Id.*  As such, the appellate court found that "this point was covered in the CALJIC 4.00 instruction, which listed the defendant's inability to distinguish legal right from wrong, and inability to distinguish moral right from wrong, as separate grounds for a finding of insanity."  *Id.*

Lastly, the appellate court held that Woo's broader argument, that the instructions as a whole favored the prosecution, was also unpersuasive.  *Id.* at *12.  The appellate court found that the trial court furnished instructions that enabled the parties adequately to argue their positions.  *Id.* at *13.  The prosecutor minimized Woo's professed motive but the instructions as a whole were sufficient to allow argument that Woo was legally insane because she truly believed that she was protecting her children by killing them.  *Id.*

**B.    Legal Standard to Challenge a Jury Instruction.**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing

instruction by itself so infected the entire trial that the resulting conviction violates due process. *See id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  ("[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S. at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990); *see also Mejia v. Garcia*, 534 F.3d 1036, 1045 (9th Cir. 2008) (finding an instruction previously found to allow for conviction of sex offense less than proof beyond a reasonable doubt ambiguous with regard to nonsexual offenses where "reasonable minds can differ in their readings"); *Ficklin v. Hatcher*, 177 F.3d 1147, 1150-51 (9th Cir. 1999) (harmless error when certain that the jury did not rely on constitutionally infirm instruction).  In order to demonstrate a violation of due process, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt.  *See Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal quotations and citations omitted).  A "meager 'possibility'" that the jury misapplied the instruction is not enough.  *Kansas v. Carr*, 136 S. Ct. 633, 643 (2016) (quoting *Boyde*, 494 U.S. at 380).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also

1  must determine that the error had a substantial and injurious effect or influence in determining the

2  jury's verdict before granting relief in habeas proceedings.  *See Brecht v. Abrahamson*, 507 U.S.

3  619, 637 (1993), *see also Calderon*, 525 U.S. at 146-47.

4          A state trial court's refusal to give an instruction does not alone raise a ground cognizable

5  in a federal habeas corpus proceedings.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir.

6  1988).  The error must so infect the trial that the defendant was deprived of a fair trial guaranteed

7  by the Fourteenth Amendment.  *See id.*  Due process requires that "criminal defendants be

8  afforded a meaningful opportunity to present a complete defense."  *Clark v. Brown*, 450 F.3d 898,

9  904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Therefore, a

10  criminal defendant is entitled to adequate instructions on the defense theory of the case.  *See*

11  *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (holding that it was error to deny defendant's

12  request for instruction on simple kidnapping where such instruction was supported by the

13  evidence).

14          The omission of an instruction is less likely to be prejudicial than a misstatement of the

15  law.  *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson*, 431 U.S. at

16  155).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction

17  bears an "especially heavy burden."  *Villafuerte v. Stewart*, 111 F.2d 616, 624 (9th Cir. 1997)

18  (quoting *Henderson*, 431 U.S. at 155).  The significance of the omission of such an instruction

19  may be evaluated by comparison with the instructions that were given.  *Murtishaw v. Woodford*,

20  255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due

21  process violation found in capital case where petitioner demonstrated that application of the wrong

22  statute at his sentencing infected the proceeding with the jury's potential confusion regarding its

23  discretion to impose a life or death sentence).

24          A state court's interpretation of state law, including one on direct appeal of the challenged

25  conviction binds a federal court sitting in review of habeas corpus.  *Bradshaw*, 546 U.S. at 76.  In

26  *Bradshaw*, the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of

27  Ohio law with regard to the doctrine of transferred intent as applied to aggravated felony murder

28  under Ohio law.  *Id.* at 75.  The United States Supreme court noted that the Ohio Supreme Court's

United States District Court
Northern District of California

1   explanation of Ohio law was clear and unambiguous.  *Id.* at 76.  As such, the Supreme Court held

2   that the Sixth Circuit erred when it disregarded the Ohio Supreme Court's interpretation of state

3   law and ruled that the doctrine of transferred intent was inapplicable to aggravated felony murder.

4   *Id.* at 75, 80.

5           With regard to drafting jury instructions, the Supreme Court noted that there is, "no

6   particular formulation [that] has evolved into a baseline for due process, and the insanity rule, like

7   the conceptualization of criminal offenses is substantially left open to state choice."  *Clark v.*

8   *Arizona*, 548 U.S. 735, 752 (2006).  In *Clark*, the Supreme Court granted certiorari to consider,

9   first, "whether due process prohibits Arizona's use of an insanity test stated solely in terms of the

10  capacity to tell whether an act charge as a crime was right or wrong," and, second, "whether

11  Arizona violates due process in restricting consideration of defense evidence of mental illness and

12  incapacity to its bearing on a claim of insanity, thus eliminating its significance directly on the

13  issue of the mental element of the crime charged."  *Id.* at 742.  The Court held that there was no

14  violation in either instance.  *Id.*  The Court noted that "history shows no deference to *M'Naghten*

15  that could elevate its formula to the level of fundamental principle so as to limit the traditional

16  recognition of a State's capacity to define crimes and defenses."  *Id.* at 749.

**C.    Analysis.**

18          Woo alleges that *People v. Skinner* advances her argument that CALJIC No. 4.00 is an

19  inadequate and inappropriate jury instruction because CALJIC No. 4.00 only requires that a

20  defendant be incapable of *distinguishing* between moral right and wrong.  In *Skinner*, the court

21  held that a defendant only needs to satisfy one prong of the *M'Naghten* test instead of requiring a

22  defendant to satisfy both prongs in order to be found legally insane.  39 Cal. 3d at 779.  Formerly,

23  the defendant was erroneously held to the higher standard of satisfying both prongs of the

24  *M'Naghten* test.  *Id.* at 779-80.  As such, a defendant had to show that he or she was incapable of

25  distinguishing legal wrongfulness *and* moral wrongfulness.  *Id.*  The Court held that knowing the

26  "nature and quality" of an act is not the same as knowing moral wrongfulness.  *Id.* at 778.  A

27  defendant may know that the nature and quality of the act was legally wrong in the sense that

28  killing is a crime, but defendant believed that the act was not only just, but expected of him.  *Id.*

20

1    While differentiating between the two prongs, the Court emphasized that a defendant must be able

2    to appreciate the moral wrongfulness – not simply know that it is legally wrong.  *Id.* at 780.  The

3    trial court held that the defendant had satisfied the moral wrongfulness prong and therefore the

4    defendant should have been found insane under the *M'Naghten* test.  *Id.* at 784.

5          Woo's argument is not persuasive because, unlike in *Skinner*, the trial court here did not

6    conflate both prongs of the *M'Naghten* test.  Rather, the trial court here distinguished each prong

7    by including the disjunctive "or" between each step of the instruction.  *Woo*, No. A127153, at *8-

8    9.  Unlike in *Skinner*, the trial court here did not find that Woo satisfied either prong of the test,

9    and as a result she was not found legally insane.

10         Similarly, in *People v. Kelley*, the California Supreme Court held that CALJIC No. 4.00

11   correctly and adequately explained the applicable law to the jury.  1 Cal. 4th at 535.  In *Kelly*,

12   defendant argued that the court's reference to a "mental disease or mental defect" prevented the

13   jury from considering both as a combination.  *Id.*  Defendant also argued that the CALJIC No.

14   4.00 instruction conflates both prongs of the *M'Naghten* test due to punctuation.  *Id.* at 536.

15   Lastly, defendant argued that "knowing or understanding" is grammatically confusing.  *Id.*

16   Ultimately, the Court rejected these arguments and found that CALJIC No. 4.00 adequately

17   conveyed the insanity test to the jury.  *Id.*

18         Woo contends that the defendant in *Kelly* did not raise the same precise argument, that the

19   "distinguish" language of CALJIC No. 4.00 does not require the same level of appreciation of

20   moral wrongfulness that the language of "knowing and understanding" of CALCRIM No. 3450

21   demands.  This is true: the Court in *Kelly* did not specifically address the same argument Woo

22   presented here.  Regardless, the appellate court here found that Woo's argument is just a slightly

23   altered but not legally significant version of the same issue and as a result is unpersuasive.  *Woo*,

24   No. A127153, at *10.  The *Kelly* Court held that CALJIC No. 4.00 in its entirety was adequate to

25   provide the applicable law for the insanity defense to a jury.  *Kelly*, 1 Cal. 4th at 535.  It the

26   Court's duty to reexamine state-court determinations on state-law questions.  *See Estelle*, 502 U.S.

27   at 67-68.  Because the appellate court held that CALJIC No. 4.00 adequately conveys the elements

28   of the insanity defense, this Court must accept the California Court of Appeal's interpretation of

United States District Court
Northern District of California

the elements of the insanity defense as presented in CALJIC No. 4.00.  *See Bradshaw*, 546 U.S. at 76.

Next, just as she did before the appellate court, Woo here contends that *People v. Jablonski* advances her argument that CALJIC No. 4.00 fails to adequately direct jurors to consider the defendant's moral understanding at the time of the offense in relation to the charged act itself. (Pet. Mem. at 35.)  The California Supreme Court in *Jablonski* held that even if CALJIC No. 4.00 were ambiguous, the additional instruction provided by the trial court focused the jury's attention on the defendant's capacity to distinguish right from wrong at the commission of the crime. *Jablonski*, 37 Cal. 4th at 831-32.  There, defendant argued that the jury instruction was flawed because it failed to inform the jury that a defendant's incapacity to distinguish right from wrong at the commission of the crime must be in relation to that act, and not a general ability to do so.  *Id.* at 831.  The Court held that the trial court supplemented CALJIC No. 4.00 with additional instructions that clearly focused the jury's attention; such as, "*If during the commission of the crime* the defendant was incapable of understanding that his act was unlawful, then he is not criminally liable." *Id.*  Therefore, the Court rejected the defendant's claim altogether without specifically addressing whether CALJIC No. 4.00 alone would be sufficient.  *Id.*

Woo argues that the trial court here erred by failing to supplement CALJIC No. 4.00. Similarly, she contends the jury instructions were inadequate because they do not establish that defendant's inability to distinguish right from wrong is specific to the charged act as opposed to defendant's general capacity.  The appellate court held, and this Court agrees, that *Jablonski* does not support this reading; rather CALJIC No. 4.00 properly focuses the jury's attention on the defendant's state of mind at the time of the criminal act.  *Woo*, No. A127153, at *10.

While Woo claims that *Jablonski's* special instructions supplemented the jury instruction CALJIC No. 4.00 thereby correcting every error, the California Supreme Court did not hold that supplementation was required.  The Supreme Court has noted that there is, "no particular formulation [that] has evolved into a baseline for due process, and the insanity rule, like the conceptualization of criminal offenses is substantially left open to state choice."  *Clark*, 548 U.S. at 752.  In order to demonstrate a due process violation, a defendant must show both ambiguity

United States District Court
Northern District of California

22

United States District Court
Northern District of California

1    and a "reasonable likelihood" that the jury applied the instruction in a way that violates the

2    Constitution, such as relieving the state of its burden of proving every element beyond a

3    reasonable doubt. *See Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal quotations

4    and citations omitted). The instruction may not be evaluated in artificial isolation, but must be

5    considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S.

6    at 72. Here, CALJIC No. 4.00 required the jury to find that the inability to distinguish right from

7    wrong existed *at the time of commission of the crime. Woo*, No. A127153, at *10 (emphasis

8    added). Therefore, this Court finds that Woo requested duplicative supplemental instructions.

9    Because CALJIC No. 4.00 already directs the jury to focus on the defendant's mindset *at the time*

10   *of commission of the crime*, the jury instructions as given did not deprive defendant of due process

11   of law. As such, this Court finds reasonable the appellate court's interpretation that CALJIC No.

12   4.00 adequately focused the jury's attention on the defendant's state of mind at the time of the

13   commission of the crime. In addition, the jury was instructed with CALCRIM No. 3450 at the

14   outset of the trial. *Id.* at *13. Therefore, the CALJIC No. 400 jury instruction was supplemented

15   by the CALCRIM No. 3450 jury instructions. As a result, the jury was further focused on the

16   defendant's mindset at the time of the commission of the crime.

17            Woo also alleges that the trial court erred by failing to provide her proffered special

18   instruction that stated, "If the defendant appreciates that her act is criminal and legally wrong, but

19   does not think it is morally wrong, she may still be criminally insane." (Pet. Mem. at 41.) Woo

20   argues that this "pinpoint" instruction was "required to be given upon request." (*Id.* at 31.) A

21   state trial court's refusal to give an instruction does not alone raise a ground cognizable in a

22   federal habeas corpus proceedings. *See Dunckhurst*, 859 F.2d at 114. The error must so infect the

23   trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.

24   *See id.* Due process requires that "criminal defendants be afforded a meaningful opportunity to

25   present a complete defense." *Clark*, 450 F.3d at 904 (quoting *California v. Trombetta*, 467 U.S.

26   479, 485 (1984)). While the defendant is entitled to a defense, due process does not require the

27   trial court to instruct on the defendant's precise theory of the case where other instructions

28   adequately cover the defense theory. *Duckett*, 67 F.3d at 743-46; *see Turner v. Calderon*, 281

23

F.3d 851, 867 (9th Cir. 2002).  The appellate court found this instruction to be redundant because the proffered instruction was already adequately covered in the CALJIC No. 4.00 instruction, "which listed the defendant's inability to distinguish legal right from wrong, and inability to distinguish moral right from wrong, as separate grounds for a finding of insanity." *Woo*, No. A127153, at *12.  This Court agrees and finds that the proposed instruction reiterated the fact that a defendant may be found legally insane if he or she was able to distinguish that the act in question was legally wrong but was incapable of distinguishing that the act was morally wrong.  Because the proposed instruction was already included in CALJIC No. 4.00, the appellate court's conclusion was reasonable.  The trial court's refusal to include Woo's duplicative proffered instruction does not raise a cognizable due process issue.

Lastly, Woo contends that the trial court's errors and the instructions, individually and cumulatively, raise grounds for a constitutional violation cognizable in federal habeas corpus proceedings.  (Pet. Mem. at 38.)  Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  *See Duckett*, 67 F.3d at 745. This Court must examine the record to determine which instructions were given and which were refused and whether the given instructions adequately embodied the defendant's theory.  *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979).  In other words, the examination allows a determination of whether the given instructions were so prejudicial as to infect the entire trial and so to deny due process.  *See id.*  The jury here was preinstructed with CALCRIM No. 3450 at the outset of the sanity phase.  *Woo*, No. A127153, at *10.  The overall jury instructions read included the clarification and proffered instructions that Woo alleges CALCRIM No. 3450 embodies and CALJIC No. 4.00 lacks.  Therefore, Woo's concern that CALJIC No. 4.00 fails to embody the deeper appreciation that the "knowing and understanding" language of CALCRIM 3450 requires in order to distinguish between moral wrongfulness is assuaged.  After a complete examination of the record, this Court finds that the given jury instructions were not prejudicial so as to deny due process.

United States District Court
Northern District of California

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  Rule 11(a) of the Rules Governing Section 2254 cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied.  Woo has failed to make a substantial showing that her claims amounted to a denial of her constitutional rights or demonstrate that a reasonable jurist would find the denial of her claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Consequently, a certificate of appealability is not warranted in this case.  A separate judgment shall issue, and the Clerk of the Court shall close this file.

**IT IS SO ORDERED.**

Dated: August 11, 2016

JEFFREY S. WHITE

United States District Judge

25